IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


**HUGH B. MCKEEN**,

        Plaintiff,

vs.                                No. **CIV 07-503 MCA/KBM**

**UNITED STATES FOREST SERVICE,** *et al.*,

        Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiff's Opening Brief in Support of Petition for Review of Agency Action* [Doc. 26] filed on January 8, 2008, and the *Federal Defendants' Motion to Dismiss* [Doc. 30] filed on March 14, 2008.  Having considered the parties' submissions, the Administrative Record, the applicable law, and otherwise being fully advised in the premises, the Court determines that Plaintiff has not established grounds for setting aside the two final agency actions which are the subject of his petition for review. The Court declines to review agency actions which are not final or to consider issues for which Plaintiff did not exhaust his administrative remedies.  Accordingly, the motion to dismiss is granted in part, and the Defendants' final agency actions are affirmed.

## I.    BACKGROUND

On May 22, 2007, Plaintiff filed a *Complaint for Injunctive and Declaratory Relief* [Doc. 1] seeking judicial review of actions by the United States Forest Service (USFS) officials who are named as Defendants in this case.  The parties subsequently filed a *Joint*

*Motion for Scheduling Order* [Doc. 16], in which they stipulated that Plaintiff's claims are brought under the provisions of the Administrative Procedure Act (APA) which generally limit the Court's review to an Administrative Record supplemented by briefs and motion papers submitted in accordance with the Federal Rules of Appellate Procedure. The Court granted the joint motion and entered an *Order* [Doc. 17] setting a briefing schedule as well as a deadline for lodging the Administrative Record. After the parties requested and received several extensions of time [Doc. 18, 19, 22, 23, 24, 25, 27, 28, 31, 32, 33, 34], briefing was completed on June 30, 2008. [Doc. 43.]

The actions for which Plaintiff seeks judicial review in this litigation concern his livestock grazing permit for the Cedar Breaks Allotment in the Glenwood Ranger District of the Gila National Forest in Catron County, New Mexico. Plaintiff was first issued a grazing permit for this allotment in 1968. [AR 1.[1]] The grazing permit was renewed in 1976, 1985, 1996, and 2004. [AR 3, 10, 41, 476.] Some of the agency actions that are the subject of Plaintiff's *Complaint* impacted the terms of the 1996 grazing permit, while others concern the terms that were included in the 2004 grazing permit.

A.      **The Permit Reduction of October 8, 2002**

The first agency action that Plaintiff seeks to challenge in his *Complaint* consists of a written decision from a USFS District Ranger dated October 8, 2002, which permanently reduced the number of livestock permitted to graze on the Cedar Breaks Allotment by 25

---

[1]Citations in this *Memorandum Opinion and Order* are to the Administrative Record (AR) that was provided to the Court on a compact disc with a chronological index ("print_index.pdf") that assigns a unique number to each document.

percent based on reports that Plaintiff over-utilized certain pastures on the allotment and failed to move his livestock to other pastures in accordance with the Annual Operating Instructions (AOI) for the allotment.  [AR 325.]  Plaintiff appealed the District Ranger's decision to the Forest Supervisor on November 16, 2002.  [AR 343.] After the Forest Supervisor affirmed the District Ranger's decision on August 22, 2003, Plaintiff pursued an appeal to the Deputy Regional Forester, who also affirmed the District Ranger's decision on November 25, 2003. [AR 463, 474.]

In his *Complaint*, Plaintiff contends that the District Ranger's decision of October 8, 2002, is arbitrary, capricious, and unsupported by the evidence, because it was issued without adequate notice and opportunity to achieve compliance and imposed a penalty that is disproportionately severe.  Plaintiff presented arguments in support of these two specific claims in his opening brief [Doc. 26]; however, Plaintiff's opening brief did not provide any legal argument or citation to authority in support of his contention that the decision of October 8, 2002, was otherwise arbitrary, capricious, or unsupported by evidence.

In response to Defendants' *Motion to Dismiss* [Doc. 30], Plaintiff subsequently withdrew his claim that the penalty imposed by that decision was too severe.  [Doc. 40.] Thus, the only issue that remains pending before the Court as to the decision of October 8, 2002, is whether Plaintiff received adequate notice and opportunity to achieve compliance before that decision was issued.

**B.**    **The Decision Notice of September 27, 2002**

The second agency action for which Plaintiff seeks judicial review in this case is the Decision Notice and Finding of No Significant Impact (FONSI) that the District Ranger issued on September 27, 2002, after preparing an Environmental Assessment (EA) regarding the reissuance of the term grazing permit for the Cedar Breaks Allotment. [AR 315.]  This Decision Notice selected a "preferred alternative" which set forth a number of terms that were subsequently included in Plaintiff's grazing permit when it was renewed in 2004.  [AR 476.] These terms include a schedule for monitoring the use of forage in each pasture according to stubble height and rotating livestock from one pasture to the next based on the results of such monitoring.  In addition, there are provisions for certain range improvements to aid in keeping livestock in the correct pasture or location.

Plaintiff appealed the Decision Notice to the Forest Supervisor on November 5, 2002. [AR 338.]  After the Forest Supervisor affirmed the Decision Notice on July 25, 2003, Plaintiff pursued an appeal to the Deputy Regional Forester, who also affirmed the Decision Notice on September 15, 2003. [AR 450, 471.]

In his *Complaint*, Plaintiff contends that the Decision Notice is arbitrary and capricious and should be set aside because it (1) calls for fencing and other improvements which are unnecessary and were not based on range science or data, (2) relies on a defective stubble-height methodology and monitoring process for determining when livestock need to be removed from a pasture, (3) refers to range improvement projects for which the Defendants subsequently failed to supply adequate materials, funding, or approval.  In his

opening brief on the merits, Plaintiff focused his arguments on the contention that the stubble-height methodology and monitoring procedure employed in the Decision Notice do not comply with statutory mandates requiring the Defendants to inventory and identify public rangeland conditions and trends, see 43 U.S.C. § 1901(b)(1), meet basic informational quality standards, see Pub. L. No. 106-554, § 1(a)(3), 114 Stat. 2763, 2763A-153 (2000) (codified as a note to 44 U.S.C.A. § 3516), and insure the professional and scientific integrity of the Decision Notice's discussions and analysis, see 40 C.F.R. § 1502.24 (2007).

Defendants respond by asserting that Plaintiff has failed to exhaust his administrative remedies with respect to these specific claims because he did not raise them during the administrative appeals process. Defendants also contend that, in any event, the issues raised in Plaintiff's opening brief do not provide grounds for setting aside the Decision Notice or any subsequent actions taken by Defendants to implement its terms. [Doc. 29, 30.]

## C.   Subsequent Implementation and Permit Modifications

Plaintiff's *Complaint* generally alleges that Defendants "failed to approve projects, fund its share of the projects, or provide the materials it agreed to provide" to implement the "preferred alternative" identified in the Decision Notice of September 27, 2002. [Doc. 1, at 25.] Although this issue is not pursued with greater specificity in Plaintiff's opening brief, the Court notes that the Administrative Record contains a letter from the District Ranger dated October 9, 2002, which addresses some of the range improvement projects that were listed in the earlier Decision Notice. [AR 326.] Plaintiff pursued an administrative appeal of this decision by letter dated November 18, 2002 [AR 345], but the District Ranger later

decided to provide Plaintiff with fencing and cattle-guard materials that he requested. [AR 391, 396, 399, 402.] Defendants contend that there is no final agency action for the Court to review with regard to such range improvement projects.

Plaintiff's *Complaint* also refers to a letter from the District Ranger dated May 22, 2006, which modified some of the language in Plaintiff's grazing permit but declined to increase the permitted number of livestock on the allotment to the levels that preceded the decision of October 8, 2002. [AR 494.]  In his opening brief, Plaintiff cites the letter dated May 22, 2006, as evidence that the Defendants' earlier actions were erroneous or not properly implemented; however, the opening brief presents no legal argument or citation to authority in support of setting aside any decision-making reflected in this letter.  Defendants contend that the challenged portions of the letter of May 22, 2006, merely reaffirm the prior decisions of September 27, 2002, and October 8, 2002, and do not amount to a "final agency action" that is subject to judicial review.

## II.   <u>ANALYSIS</u>

### A.   <u>Standard of Review</u>

Plaintiff seeks to challenge the Defendants' actions based on the provisions for judicial review of administrative decision-making contained in the Administrative Procedure Act (APA), 5 U.S.C. §§ 558 to 706.   The APA limits such review in several important respects.  As a general matter, the Court's inquiry must focus on whether the Defendants "(1) acted within the scope of their authority, (2) complied with prescribed procedures, and (3)

took action that was neither arbitrary and capricious, nor an abuse of discretion." Wyoming Farm Bureau Federation v. Babbitt, 199 F.3d 1224, 1231 (10th Cir. 2000).

To answer these questions, the Court is not permitted to convene a *de novo* trial or act as an independent factfinder, because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983). Thus, the Court is limited to foraging among the documents contained in the Administrative Record and the briefs that the parties have submitted in accordance with the Federal Rules of Appellate Procedure. See Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994). Under those rules, "'arguments inadequately briefed in the opening brief are waived.'" Robbins v. Bureau of Land Management, 438 F.3d 1074, 1087 (10th Cir. 2006) (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998)).

Further, the APA does not permit the Court to disregard or set aside an agency's factual determinations unless they are unsupported by substantial evidence. See Wyoming Farm Bureau Federation, 199 F.3d at 1231. "The substantial-evidence standard does not allow a court to displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Trimmer v. United States Dep't of Labor, 174 F.3d 1098, 1102 (10th Cir. 1999) (quotation marks and citations omitted). Thus, while I appreciate that Plaintiff has grazed livestock on the Cedar Breaks Allotment for many years and is uniquely familiar with conditions on the ground there, the law does not permit the Court to credit his expertise over

that of the Defendants where the parties cite conflicting evidence to resolve a dispute over factual issues.

The APA also imposes some limitations on what actions the Court is permitted to review. Sections 704 of the APA places the burden on Plaintiff to show that Defendants took "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704; see Colo. Farm Bureau Fed'n v. United States Forest Serv., 220 F.3d 1171, 1173-74 (10th Cir. 2000). "Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality," federal courts "intervene in the administration of laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." Lujan v. National Wildlife Federation, 497 U.S. 871, 894 (1990). The APA's "principal purpose" in limiting judicial review to final agency actions "is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004); accord Lujan, 497 U.S. at 891-94.

Thus, the requirement of "final agency action" serves to preclude courts from using the APA as a pretext to enter "general orders compelling compliance with broad statutory mandates" or to inject themselves "into day-to-day agency management." Norton, 542 U.S. at 66-67. This requirement makes clear that the APA does not provide courts with the authority to conduct a "general judicial review" of an agency's "day-to-day operations." Lujan, 497 U.S. at 899.

-8-

Agency action is not "final" for purposes of Section 704 of the APA until "an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule." Darby v. Cisneros, 509 U.S. 137, 146 (1993); accord Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 n. 9 (10th Cir. 2005).  One component of this exhaustion requirement is that a party seeking judicial review must demonstrate that the claims now brought before a federal court were first raised during the administrative process, such that the agency was on notice of those claims and had an opportunity to consider and decide how to resolve them.  See Silverton Snowmobile Club v. United States Forest Service, 433 F.3d 772, 783 (10th Cir. 2006) (collecting cases).  In other words, "a plaintiff must present its claim to USFS in sufficient detail to allow the agency to rectify the alleged violation" before the matter goes to court.  Forest Guardians v. United States Forest Service, 495 F.3d 1162, 1171 (10th Cir. 2007).  This requirement serves to prevent administrative proceedings from becoming

> a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 553-54 (1978); accord Kleissler v. U.S. Forest Serv., 183 F.3d 196, 202 (3rd Cir.1999).

## B.    The Permit Reduction of October 8, 2002

Applying the above standards, the only challenge to the District Ranger's decision of October 8, 2002, that is properly before this Court at this juncture is whether that decision

complies with Section 558(c) of the APA. This statutory provision states, in relevant part, that:

> Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given--
> (1) notice by the agency in writing of the facts or conduct which may warrant the action; and
> (2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c). Forest Service regulations and policy statements contain similar provisions for notice and opportunity to respond before final actions are taken. See, e.g., 36 C.F.R. § 251.93(a) (2008). To the extent such regulations or policy statements are enforceable in this context, the Court's analysis of the Defendants' compliance with them parallels the analysis of Defendants' compliance with 5 U.S.C. § 558(c).

The APA defines a "license" to include "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8). The parties do not dispute that this provision of the APA applies to grazing permits issued by the USFS. See Anchustegui v. Dep't of Agriculture, 257 F.3d 1124, 1128-29 (9th Cir. 2001). They also do not dispute that the District Ranger's letter of October 8, 2002, amounts to the withdrawal, suspension, revocation, or annulment of a part of Plaintiff's grazing permit in this case, insofar as it reduces the number of cattle permitted on the allotment by 25 percent. [AR 325.]

Plaintiff contends that he was not given adequate notice and opportunity to achieve compliance with the terms of his grazing permit in this case because he did not receive correspondence from the Defendants in a timely manner, and because the correspondence which he did receive prior to the District Ranger's letter of October 8, 2002, demanded compliance by a deadline that was impossible to meet and did not specifically advise him of what sanction the Defendants would seek to impose if he did not comply.  These contentions do not find support in the Administrative Record or in the applicable law.

The provision of the APA cited above "does not require that a respondent be apprised of precisely what action the agency will take because of his conduct."  Lawrence v. Commodity Futures Trading Comm'n, 759 F.2d 767, 773 n.13 (9th Cir. 1985).  Rather, the statute only requires "notice by the agency in writing of *the facts or conduct which may warrant the action*."  5 U.S.C. § 558(c) (emphasis added).

Similarly, Section 558(c) of the APA does not require the agency to provide an opportunity for a full adjudicatory hearing before withdrawing, suspending, revoking, or annulling part of a license.  See Gallagher & Ascher Co. v. Simon, 687 F.2d 1067, 1074 (7th Cir. 1982).  Rather, this statutory provision only requires an "opportunity to demonstrate or achieve compliance with all lawful requirements" *after* a written notice of non-compliance is delivered but *before* "the institution of agency proceedings" to withdraw, suspend, revoke, or annul a license.  5 U.S.C. § 558(c).

If the same document containing the written notice of non-compliance also contains an order setting the matter for a full adjudicatory hearing to show cause why a particular

sanction should not be imposed, then that document would institute agency proceedings at the same time the notice was issued.  The statute does not allow the agency to give written notice of non-compliance and institute agency proceedings in a single document, because under that scenario there would be no opportunity to correct the non-compliance identified in the notice before the agency proceedings began.  See Anchustegui, 257 F.3d at 1129.

Here the agency followed the correct procedure by issuing the written notice of non-compliance in a separate document (or series of documents) before instituting the agency proceeding at issue.  The District Ranger's letter of October 8, 2002, which reduced the permitted number of livestock on the allotment by 25 percent, referenced an earlier written notice of non-compliance dated September 13, 2002.  [AR 325.]  The written notice of non-compliance dated September 12, 2002 [AR 303], in turn stated that livestock were observed in the South Cedar Breaks Pasture on September 6, 2002, and September 8, 2002, in violation of Annual Operating Instructions issued on August 8, 2002 [AR 268].  Those instructions stated, among other things, that all livestock were to be moved into the Stout Mesa portion of the North Cedar Breaks Pasture, "based on below-average forage production and documented excessive utilization in both the North and South Cedar Breaks pastures." [AR 303.]  In addition to moving livestock out of the South Cedar Breaks Pasture, the written notice of non-compliance dated September 12, 2002, directed Plaintiff to "follow the grazing schedule outlined in your Annual Operating Instructions," which required Plaintiff to move his livestock out of a pasture before maximum use levels specified in those instructions were exceeded. [AR 303.]

Plaintiff asserts that the written notice of September 12, 2002, did not provide sufficient opportunity to achieve compliance with such instructions because it gave a deadline of September 13, 2002, to remove livestock from the South Cedar Breaks Pasture. If the written notice was mailed on September 12, 2002, it is possible that Plaintiff did not receive or review it until after the end of the work day on September 13, 2002.  Although there is an earlier agreement specifying that livestock would be removed within a period of twelve hours after Plaintiff received notification unless the District Ranger found "extenuating circumstances" [AR 191], Plaintiff asserts in his reply brief that it takes several days to marshal the resources necessary to move livestock from one pasture to another. [Doc. 39, at 7-8.]

These assertions do not provide a basis for setting aside the District Ranger's decision dated October 8, 2002, because that decision was not premised on a single instance of Plaintiff failing to remove his livestock from the South Cedar Breaks Pasture by September 13, 2002.  Rather, the decision of October 8, 2002, referenced additional inspections of the allotment conducted with Plaintiff's participation on October 3, 2002. [AR 322, 323.] USFS officials also met with Plaintiff in person and spoke with him on the telephone both before and after the written notice of non-compliance was mailed on September 12, 2002. [AR 304, 307.]

The inspections conducted on October 3, 2002, revealed that Plaintiff was not complying with the broader directive contained in the written notice of September 12, 2002, namely that "you must move your livestock out of a pasture before maximum use levels

-13-

specified in your annual operating instructions are exceeded." [AR325, quoting AR 303.]
Based on these additional inspections, the decision of October 8, 2002, found that Plaintiff
had "exceeded utilization standards in South Cedar Breaks, North Cedar Breaks, and now,
the Community Pasture." [AR 325.]

Thus, the Court's review of the Administrative Record reveals substantial evidence
to support the conclusion that Plaintiff was afforded notice and an opportunity to achieve
compliance between the time the written notice of non-compliance was delivered and the
time that the additional inspections occurred on October 3, 2002.  Other courts agree that the
requirements of 5 U.S.C. § 558(c) are satisfied by the procedure employed here, which
involved conducting an additional inspection weeks after the written notice of non-
compliance is issued, and then taking action to cancel or suspend a license or permit based
on the results of that additional inspection.  See, e.g., Moore v. Madigan, 990 F.2d 375, 377,
380 (8th Cir. 1993); Parchman v. U.S. Dep't of Agriculture, 852 F.2d 858, 865 (6th Cir.
1988); Fish Creek Cattle Co. v. U.S. Forest Serv., No. 05-CV-147-B, 2006 WL 1582374, at
*5 (D. Wyo. 2006) (unpublished disposition).

In addition to the District Ranger's decision of October 8, 2002, which is the subject
of the present appeal, the Administrative Record is replete with numerous complaints and
other documents evincing Plaintiff's unauthorized livestock grazing and other unauthorized
activities on Forest Service land going back as far as 1991. [AR 15, 23, 38, 42, 46, 47, 48,
51, 59, 62, 77, 94, 152, 157, 158, 168, 172, 220, 230, 232, 236, 279 288, 292.]  Indeed,
Defendants or their predecessors had proposed reducing the number of livestock on the

allotment on previous occasions. [AR 158, 172.] These proposals resulted in a mediated agreement dated June 27, 2001, which resulted in a five-percent reduction for a period of one year. [AR 191.] Based on reports indicating that Plaintiff was not complying with the terms of the mediated agreement, which required Plaintiff to keep his livestock out of National Forest Lands on the San Francisco River [AR 220], the District Ranger issued a written notice of non-compliance dated May 24, 2002, which mentioned that a follow-up inspection would be conducted in the next several days. [AR 230.] Such follow-up visits to the site in question [AR 232] revealed further non-compliance, and thus the District Ranger issued a decision dated June 5, 2002, permanently reducing the number of livestock permitted on the allotment by five percent and suspending an additional 20 percent for two years. [AR 236.] Plaintiff was in the process of appealing the District Ranger's decision of June 5, 2002 [AR 249], when the Defendants began documenting the events which led to the written notice of non-compliance dated September 12, 2002, which is discussed above.

Thus, the instances of non-compliance documented in the notice of September 12, 2002, and the District Ranger's decision of October 8, 2002, can be viewed against a backdrop of previous agency actions which provided additional notice and additional opportunities to achieve compliance with the terms of Plaintiff's grazing permit and the other USFS directives that were authorized in conjunction with that permit. To the extent that the agency already "instituted proceedings" within the meaning of 5 U.S.C. § 558(c) by virtue of the District Ranger's decision of June 5, 2002 [AR 236], or the prior decision of May 15, 2001 [AR 172], which led to the mediated agreement of June 27, 2001 [AR 191], such

proceedings also were preceded by the written notice and opportunity to achieve compliance required by 5 U.S.C. § 558(c), as well as several meetings to seek informal resolution of the matter.  [AR 152, 158, 209, 218, 220, 230, 232.]

Accordingly, these statutory requirements do not provide a basis for setting aside the District Ranger's decision of October 8, 2002.  That decision [AR 325], as well as the decisions issued by the Forest Supervisor and the Deputy Regional Forester during the administrative-appeals process [AR 463, 474], are affirmed.

### C.    The Decision Notice of September 27, 2002

Plaintiff also seeks to challenge the District Ranger's Decision Notice of September 27, 2002 [AR 315], which  marked the culmination of the agency's decision-making process under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4332, and selected a "preferred alternative" consisting of a set of terms and conditions that were included in Plaintiff's grazing permit when it was reissued in 2004.  [AR 476.] Before turning to the merits of this challenge, I must determine whether or to what extent it is properly before the Court.

The Tenth Circuit has repeatedly held that an agency's decisions about whether to renew a grazing permit, and whether to change the terms and conditions of the permit upon its renewal, are discretionary and unconstrained by any constitutionally protected property interest in retaining the terms or conditions of a previous permit.  See Federal Lands Legal Consortium v. United States, 195 F.3d 1190, 1198-1200 (10th Cir. 1999) (collecting cases). Thus, the injury occasioned by the Defendants' failure to renew a grazing permit on terms

-16-

favorable to Plaintiff "is not redressable in court because a court may not order the agency to perform what is a purely discretionary act." Bischoff v. Myers, 216 F.3d 1086, 2000 WL 743686, at *2 (10th Cir. 2000) (unpublished opinion citing Baca v. King, 92 F.3d 1031, 1035-37 (10th Cir. 1996)).

Nevertheless, the issuance of a decision notice under NEPA constitutes a "final agency action" that is subject to judicial review under the APA. See Catron County Bd. of Comm'rs v. United States Fish and Wildlife Serv., 75 F.3d 1429, 1434 (10th Cir. 1996). Although further analysis is required to identify which issues Plaintiff specifically raised before the agency, there is no question that Plaintiff pursued and exhausted some form of administrative appeal with respect to the Decision Notice at issue here. I therefore conclude that Plaintiff's challenge to the agency's decision-making under NEPA is properly before this Court.

The scope of the Court's review under NEPA is quite limited, however, because NEPA is a procedural statute that "does not mandate particular results," Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1162-63 (10th Cir. 2002), or "impose substantive limits on agency conduct," Friends of the Bow v. Thompson, 124 F.3d 1210, 1213 (10th Cir. 1997). Rather, the twin goals of this statute are simply to ensure that "'important effects will not be overlooked or underestimated'" before the Government acts, and to "'provide a springboard for public comment'" in order to ensure that an agency "'has indeed considered environmental concerns in its decisionmaking process.'" Lee v. U.S. Air

Force, 354 F.3d 1229, 1237 (10th Cir. 2004) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348-49 (1989)).

The Decision Notice issued under NEPA in this case is premised on an Environmental Assessment (EA) dated July 19, 2002, which was subjected to public comment.  [AR 259, 261.]   NEPA's implementing regulations define an EA as "a concise public document for which a Federal agency is responsible that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1) (2007); see Friends of the Bow, 124 F.3d at 1214.   Under these regulations, "agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking." 40 C.F.R. § 1501.3(b) (2007).  NEPA's implementing regulations further require that an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by Section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." Id. § 1508.9(b).  In addition, the agency must "[p]repare a finding of no significant impact [FONSI] . . . if the agency determines on the basis of the environmental assessment not to prepare a[n environmental impact] statement." Id. § 1501.4(e); see Friends of the Bow, 124 F.3d at 1214.

In this case, Plaintiff's opening brief asserts that the Decision Notice dated September 27, 2002, is flawed because it relies on a monitoring regime that includes stubble-height measurements.  Plaintiff's opening brief further asserts that Defendants' reliance on this monitoring regime lacks the scientific integrity required under NEPA's implementing

regulations, see 40 C.F.R. § 1502.24, and does not comply with the informational quality standards contained in the "Data Quality Act," see Pub. L. No. 106-554, § 1(a)(3), 114 Stat. 2763, 2763A-153 (2000) (codified as a note to 44 U.S.C.A. § 3516).

Without any citation to the Administrative Record, Plaintiff's opening brief also refers to "a current USFS memorandum find[ing] that stubble height determination is not a suitable methodology for managing the range." [Doc. 26, at 38.]  Instead of relying so heavily on this methodology, Plaintiffs' opening brief suggests that Defendants should have looked to an "inventory of range conditions and record of trends of range conditions" that the Secretary of Agriculture was required to "update, develop, . . . and maintain" under the Public Rangelands Improvement Act (PRIA), and the Federal Land Policy and Management Act (FLPMA).  43 U.S.C. §§ 1901(b)(1), 1903(a).

Plaintiff did not specifically cite the above statutes or regulations during the administrative process, and in some instances he does not provide a correct citation to them in his opening brief.  Nevertheless, his administrative appeal can be reasonably construed as raising a more general factual disagreement with the agency's findings concerning the accuracy or consistency of the monitoring regime employed in preparing the Decision Notice of September 27, 2002, and referenced in the preferred alternative that was selected for inclusion in Plaintiff's 2004 grazing permit.

To the extent such a factual dispute was raised during the administrative proceedings, I conclude that it does not provide a basis for setting aside that Decision Notice or the terms included in the 2004 grazing permit.  Assuming that there is some dispute in the scientific

community as to the quality, utility, objectivity, integrity, or relevance of stubble-height measurements as a range-management tool, it is not the Court's role to decide which of the conflicting expert opinions in this dispute are more credible or persuasive. "'An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise.'" Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1213 (10th Cir.2002) (quoting Comm. to Preserve Boomer Lake Park v. Dep't of Transp., 4 F.3d 1543, 1555 (10th Cir.1993)). When experts "express conflicting views" in this context, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989).

Here the Court's review of the Administrative Record reveals a Forest Service memorandum dated July 27, 2005, which "identifies appropriate long- and short-term riparian assessment and monitoring protocols for use on grazing allotments in eastern Oregon and Washington in watersheds containing Endangered Species Act (ESA) listed salmon, steelhead, and bull trout." [AR 487.] In that context, the memorandum concludes that "stubble height monitoring data alone should not be used as a substitute for long-term rangeland ecological monitoring." [AR 487.]

On its face, the Forest Service memorandum of July 27, 2005, does not apply to the use of stubble-height measurements on the Cedar Breaks Allotment as referenced in the Decision Notice of September 27, 2002, because the Cedar Breaks Allotment is not a grazing allotment in eastern Oregon or Washington containing EAS listed salmon, steelhead, or bull

-20-

trout.  Indeed, the Forest Service memorandum of July 27, 2005, did not even exist at the time the Decision Notice of September 27, 2002, was issued or at the time the administrative appeals process for that decision was exhausted in 2003.

To show that an agency decision is arbitrary and capricious, Plaintiff cannot rely on evidence that did not exist and was not before the agency at the time of its decision.  <u>See</u> <u>Utah Environmental Congress v. Troyer</u>, 479 F.3d 1269, 1282 (10th Cir. 2007); <u>Greenpeace</u> <u>Action v. Franklin</u>, 14 F.3d 1324, 1334 (9th Cir. 1992).  Considering such post-decisional evidence undermines the framework for judicial review set forth in <u>Olenhouse</u>, 42 F.3d at 1578-80, because the agency never had the chance to provide an explanation for accepting or rejecting the new evidence at the time its decision was made, and thus the Court is asked to rely on "[a]fter-the-fact rationalization by counsel in briefs or argument."  <u>Id.</u> at 1575.

For these reasons, the Court focuses its review on the evidence that reached the agency before the Decision Notice was issued and the administrative-appeals process for that decision was exhausted.  During this period, the record reflects that the agency received advice from a range expert, Dr. Jerry Holechek, who advocated the use of stubble-height measurements for managing various types of  rangelands that are present in New Mexico.  [AR 90, 195.] Many of the public comments that were submitted in response to the EA also advocate the "preferred alternative" which incorporates the use of such measurements as a range-management tool. [AR 274, 275, 280, 282, 283, 284, 285, 286.]  While there may be scientific debate as to exactly what stubble height in which areas of a pasture should be considered the minimum level required to support grazing, the Court's review of the

Administrative Record reveals substantial evidence to support the agency's use of stubble-height measurements as a range-management tool in preparing the Decision Notice dated September 27, 2002, and as an element of the "preferred alternative" that the agency selected in that Decision Notice.

The Administrative Record further evinces that Defendants inventoried and considered the record of range conditions and trends on the Cedar Breaks Allotment when preparing the EA.  In particular, the record includes a "Cedar Breaks Allotment Range Specialist Report" that contains a lengthy discussion of range conditions and trends on the allotment as well as the predicted effects of each alternative identified in the EA.  [AR 222, 259.]  Thus, the Decision Notice dated September 27, 2002, does not rely on stubble-height measurements *alone* as a substitute or replacement for other forms of rangeland monitoring. For all of the above reasons, the Court's careful review of the record does not reveal a basis for setting aside the District Ranger's Decision Notice of September 27, 2002, under the standard articulated in Section 706 of the APA.

### D.    Subsequent Implementation and Permit Modifications

The remaining issues raised in Plaintiff's opening brief concern the implementation of the preferred alternative that was selected in the Decision Notice of September 27, 2002, and incorporated in the 2004 renewal of Plaintiff's grazing permit for the Cedar Breaks Allotment.  In particular, Plaintiff's opening brief refers to monitoring activities conducted after the Decision Notice of September 27, 2002, was issued, range-improvement projects for which Defendants allegedly failed to provide funding, labor, or materials after that

-22-

Decision Notice was issued, and the Defendants denial of Plaintiff's subsequent request to increase the livestock permitted on the allotment to the number which predated the District Ranger's decision of October 8, 2002.

As previously noted, the APA does not permit the Court to set aside an agency action based on new evidence that did not exist at the time the agency's final decision was made and the administrative appeals process was exhausted.  See Troyer, 479 F.3d at 1282; Franklin, 14 F.3d at 1334.  Thus, the Court is not in a position to draw the inference that Defendants' earlier decisions in the Fall of 2002 were rendered arbitrary and capricious by subsequent activities or evidence that did not come to light until after those decisions were made.

The mere fact that the agency later changed its position with respect to some of the elements that were incorporated into the 2004 grazing permit does not necessarily mean that the earlier Decision Notice regarding that permit was unlawful, because

> [a]n agency is not bound by its prior position. "The law does not require an agency to stand by its initial policy decisions in all circumstances." Exxon Corp. v. Lujan, 970 F.2d 757, 762 n. 4 (10th Cir.1992). Changes in policy can be upheld when such change is explained with a reasoned analysis. See id. And in evaluating whether the analysis is reasoned, we must defer to the agency's expertise.

Center for Native Ecosystems v. Cables, 509 F.3d 1310, 1327 (10th Cir. 2007) (additional citations omitted).

In this case, the Administrative Record documents several instances in which the Defendants subsequently changed their positions on certain issues in order to mitigate the

impacts of the "preferred alternative" that was selected in the Decision Notice dated September 27, 2002.  For example, the District Ranger changed the agency's position with respect to providing Plaintiff with certain fence materials and cattle guards on March 6, 2003. [AR 391, 396, 431.]  Another letter dated May 22, 2006, documented the District Ranger's decision that a number of range improvements specified in the Decision Notice of September 27, 2002, were no longer necessary. [AR 494.]  With respect to the remaining range improvements that had not been completed as of that date, the District Ranger agreed to modify the permit's construction schedule so that they could be phased in over the course of more than one year. [AR 494.]   To the extent that these permit modifications were granted at Plaintiff's request, he is not "adversely affected or aggrieved" by them within the meaning of the APA, see 5 U.S.C. § 702; Western Shoshone Business Council v. Babbitt, 1 F.3d 1052, 1055 (10th Cir. 1993), and the controversy regarding the permit conditions so modified is moot, see S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997).

In the same letter of May 22, 2006, which modified the permit as set forth above, the District Ranger denied Plaintiff's request to increase the livestock permitted on the allotment to the number that existed before the earlier decision of October 8, 2002.  Plaintiff attempted to appeal the District Ranger's refusal to grant his request to increase the number of livestock permitted on the allotment [AR 496, 499, 500, 503], but Defendants rejected these attempts [AR 497, 501, 502, 504].

The District Ranger's decision not to increase the number of livestock permitted on the allotment in May 2006 is not properly before the Court because, as noted above, "a court

may not order the agency to perform what is a purely discretionary act." Bischoff, 216 F.3d 1086, 2000 WL 743686, at *2 (citing Baca, 92 F.3d at 1035-37). In other words, the APA authorizes courts to "compel agency action," 5 U.S.C. § 706(1), only when "an agency has failed to take a *discrete* agency action that it is *required to take*." Norton, 542 U.S. at 64.

Here there was no discrete legal requirement for the agency to increase the number of livestock permitted on the Cedar Breaks Allotment in May 2006. Simply renewing a request to reconsider an earlier decision at that time does not create such a requirement, especially when the agency treated the earlier decision as final and the administrative-appeals process for that decision already was exhausted. Cf. 36 C.F.R. § 251.83(o) (2008) (stating that a reaffirmation of a prior decision is not appealable under USFS regulations). As of May 2006, the permit reduction implemented on October 8 2002, already had been deemed final and gone through the administrative-appeals process; the grazing permit already had been renewed for a ten-year period beginning in 2004 [AR 476]; the NEPA process associated with that permit renewal already had been completed [AR 315, 450, 471]; and the Annual Operating Instructions for the 2006 grazing season already had been issued [AR 490]. Plaintiff's opening brief identifies no further discrete actions that the agency was *required* to take with respect to the number of livestock permitted on the Cedar Breaks Allotment at that juncture.

Instead, Plaintiff presents an ongoing critique of the agency's day-to-day management activities with respect to implementing the terms of the 2004 grazing permit which resulted from the Decision Notice dated September 27, 2002. For example, Plaintiff's opening brief

refers to a training session for measuring stubble height on January 28, 2003 [AR 378], and a temporary "grazing agreement" signed by Dr. Holechek on May 17, 2003 [AR 417]. The Administrative Record also contains documentation of Plaintiff's administrative appeal of a 2002 amendment to his Annual Operating Plan [AR 334] based on concerns about the monitoring used to determine when a pasture was over-utilized.  [AR 355, 366.]

As noted above, it is not the Court's role to intervene in such factual disputes about conditions on the allotment or the efficacy of certain monitoring techniques.  See Wyoming Farm Bureau Federation, 199 F.3d at 1231.  Monitoring range conditions on the Cedar Breaks Allotment is a day-to-day management activity of a tentative or interlocutory nature, and the Defendants decision to amend the Annual Operating Plan in 2002 is supported by substantial evidence.  [AR 365, 381, 401.]

The Court also has reviewed the correspondence in the Administrative Record concerning the status of the fencing and cattle guards that Plaintiff requested. Although the record reflects an ongoing series of demands by Plaintiff to modify previous agreements or decisions on this issue, there is substantial evidence that Defendants provided fencing and range improvements requested by Plaintiff on several occasions.  In particular, the record reflects that the agency agreed to participate in the construction of the river fence, but Plaintiff became dissatisfied with the location of the fence after the agreement was made. At one point, he placed restrictions on the ability of USFS personnel to access his private land for purposes of building or maintaining that fence.  After the fence was built, it was washed out or damaged during a flood; then Plaintiff became dissatisfied with the manner

in which it was reconstructed and wanted the location of a road readjusted.  After that issue

was addressed, Plaintiff demanded additional materials for fencing in another location.  [AR

191,  209, 233, 235, 240, 245, 246, 252, 256, 289, 291, 294, 307, 321, 326, 330, 337, 345,

346, 379, 388, 391, 392, 396, 398, 399, 402, 408, 412, 414, 420, 431.]  This correspondence

again reveals a series of day-to-day management activities of a tentative or interlocutory

nature, in which the agency was responding to ongoing, seasonal changes in conditions or

events which arose after the Decision Notice was issued.

In his opening brief filed with this Court, Plaintiff does not specify which of these

activities is a "final agency action" or cite any specific legal authority that would allow the

Court to review such activities on an ongoing basis.  In his reply brief, Plaintiff points to the

his mediated agreement with the USFS District Ranger dated July 27, 2001, as a discrete

agency action.  But that agreement was meant to close the record on an earlier appeal without

a decision on the merits, leaving the resolution of long-term issues for the NEPA process that

was pending at that time. [AR 191.]

Under these circumstances, the APA does not provide for a  "general judicial review"

of an agency's "day-to-day operations" several years later, Lujan, 497 U.S. at 899, especially

when the agency's subsequent activities in responding to Plaintiff's numerous complaints are

of a tentative or interlocutory nature, see Bennett v. Spear, 520 U.S. 154, 178-79 (1997).

While the Court has carefully reviewed the Administrative Record concerning the issues of

fencing, monitoring, and range improvements after the Decision Notice was issued, the

conclusory references to such activities in Plaintiff's opening brief fail to provide any lawful

basis for setting aside the agency's decision-making under the APA.  Such "'arguments inadequately briefed in the opening brief are waived.'" <u>Robbins</u>, 438 F.3d at 1087 (quoting <u>Adler</u>, 144 F.3d at 679).

III.     **<u>CONCLUSION</u>**

For the foregoing reasons, the Court determines that Plaintiff has not established grounds for setting aside the Defendants' final agency actions dated September 27, 2002 [AR 315], and October 8, 2002 [AR 325].  Those decisions are therefore affirmed.  Defendants' *Motion to Dismiss* is granted in part with respect to the remaining agency actions which are not final or for which Plaintiff did not exhaust his administrative remedies.

**IT IS THEREFORE ORDERED** that Defendants' final agency actions dated September 27, 2002, and October 8, 2002, are **AFFIRMED**, and Plaintiff's claims regarding those actions are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the *Federal Defendants' Motion to Dismiss* [Doc. 30] is **GRANTED IN PART** with respect to the remaining actions which are not final or for which Plaintiff failed to exhaust his administrative remedies, and Plaintiff's claims regarding those remaining actions are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED** this 31st day of October, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

-28-